No. 19 July 7, 2023 247

IN THE SUPREME COURT OF THE
STATE OF OREGON

Jamie MARTINEAU,
Personal Representative of the Decedent,
Aaron Martineau,
*Respondent on Review,*

*v.*

McKENZIE-WILLAMETTE MEDICAL CENTER,
an assumed business name of
McKenzie-Willamette Regional Medical Center Associates,
a limited liability company,
*Defendant,*

*and*

RADIOLOGY ASSOCIATES, P.C.,
a Corporation;
Dariusz Zawierucha, M.D.,
an individual,
*Petitioners on Review,*

*and*

CASCADE MEDICAL ASSOCIATES,
the assumed business name of
Doctor's Emergency Room Corporation, P.C.,
a corporation; and
Gary Josephsen, M.D., an individual,
*Petitioners on Review.*

(SC S069760) (Control)

Jamie MARTINEAU,
Personal Representative of the Decedent,
Aaron Martineau,
*Respondent on Review,*

*v.*

McKENZIE-WILLAMETTE MEDICAL CENTER,
an assumed business name of
McKenzie-Willamette Regional Medical Center Associates,
a limited liability company,
*Defendant,*

*and*

RADIOLOGY ASSOCIATES, P.C.,
a Corporation;
Dariusz Zawierucha, M.D.,
an individual,
*Petitioners on Review,*
*and*

CASCADE MEDICAL ASSOCIATES,
the assumed business name of
Doctor's Emergency Room Corporation, P.C.,
a corporation; and
Gary Josephsen, M.D., an individual,
*Petitioners on Review.*

(SC S069762)

(CC 17CV36517) (CA A172846)
(SC S069760 (Control); S069762)

On review from the Court of Appeals.*

Argued and submitted March 9, 2023, at University of Oregon School of Law, Eugene, Oregon.

Hillary A. Taylor, Keating Jones Hughes, P.C., Portland, argued the cause for petitioners Cascade Medical Associates and Gary Josephsen, M.D. Lindsey H. Hughes, Keating Jones Hughes, P.C., Portland, filed the brief for petitioners Cascade Medical Associates and Gary Josephsen, M.D. Also on the brief was Hillary A. Taylor.

Alice S. Newlin, Lindsay Hart, LLP, Portland, argued the cause and filed the brief for petitioners Radiology Associates, P.C. and Dariusz Zawierucha, M.D. Also on the brief were Nikola L. Jones and Jay W. Beattie.

Travis Eiva, Eiva Law, Eugene, argued the cause and filed the brief for respondent on review Jamie Martineau.

Ruth A. Casby, Hart Wagner LLP, Portland, filed the brief for *amici curiae* Oregon Medical Association and American Medical Association. Also on the brief was Janet M. Schroer.

_____

* Appeal from Lane County Circuit Court, Charles D. Carlson, Judge. 320 Or App 534, 514 P3d 520 (2022).

Rhett G. Fraser, Huegli Fraser PC, Portland, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

Before Flynn, Chief Justice, and Duncan, Garrett, DeHoog, Bushong, Justices, and Walters and Nakamoto, Senior Judges, Justices pro tempore.**

BUSHONG, J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

Flynn, C. J., concurred in part and concurred in the judgment, and filed an opinion, in which Walters, S. J., joined.

––––––––––––––

** James, J., did not participate in the consideration or decision of this case.

**BUSHONG, J.**

In this wrongful death action—which raises multiple claims of medical negligence against physicians and others—we must decide two questions. The first is whether the trial court erred when it instructed the jury that physicians "are not negligent merely because their efforts were unsuccessful" and that a physician "does not guarantee a good result by undertaking to perform a service." The second is whether plaintiff had alleged a lost chance claim under Oregon's survival statute, ORS 30.075, that is separately cognizable from her wrongful death claim under ORS 30.020.[1] In the proceedings below, the trial court dismissed plaintiff's lost chance claim before trial. Later, when submitting the wrongful death claim to the jury at the close of trial, the court included the challenged instruction—which was taken from Uniform Civil Jury Instruction (UCJI) 44.03 at defendants' request—in its instructions to the jury. After the jury returned a verdict in defendants' favor, plaintiff appealed, and the Court of Appeals reversed, concluding that the trial court had erred in dismissing plaintiff's lost chance claim and by including UCJI 44.03 in the jury instructions. *Martineau v. McKenzie-Willamette Medical Center*, 320 Or App 534, 514 P3d 520 (2022). We allowed defendants' petition for review and now conclude that plaintiff did not allege a lost chance claim that is cognizable under Oregon law, and, further, that the trial court did not err when it included UCJI 44.03 in the jury instructions. We therefore reverse the decision of the Court of Appeals and affirm the judgment of the trial court.

## I.   FACTS AND PROCEEDINGS BELOW

A.  *Facts*

The facts are taken from plaintiff's complaint, assuming the truth of the allegations stated therein. *See Brennen v. City of Eugene*, 285 Or 401, 405, 591 P2d 719 (1979) (when assessing whether trial court erred in granting

---

[1]  In her complaint, plaintiff asserted two wrongful death claims (one for negligence and one for negligence *per se*) and two separate claims based on a loss-of-chance theory (one alleging negligence and the other alleging breach of contract). For ease of reference, we refer to those categories of claims, respectively, as plaintiff's wrongful death claim and her lost chance claim.

a motion to dismiss, appellate court assumes the truth of all well-pleaded allegations and any facts that might be adduced as proof of those allegations); *see also Purdy v. Deere and Company*, 355 Or 204, 231-32, 324 P3d 455 (2014) (appellate court must review the evidence at trial only when determining whether an instructional error was harmless).

In 2014, decedent Aaron Martineau, age 28, arrived at the McKenzie-Willamette Hospital emergency room, complaining of sudden onset chest pain, shortness of breath, and other symptoms. He was seen by a physician assistant and by a physician, defendant Josephsen; both worked for defendant Doctor's Emergency Room Corporation, P.C. (collectively, the ER defendants). They ordered a chest x-ray, which was reviewed by a radiologist, defendant Zawierucha, who worked for defendant Radiology Associates, P.C. (collectively, the Radiology defendants).

Defendants did not adequately review the x-ray or refer decedent for further imaging or other tests to rule out or confirm the presence of serious cardiovascular or cardio-pulmonary conditions. Instead, they diagnosed him with noncardiac chest pain and discharged him from the hospital. Approximately 24 hours after being discharged, decedent died from an aortic dissection in his heart.[2]

B.  *Proceedings Below*

Decedent's wife, as personal representative of his estate, filed an action against defendants, alleging two sets of claims. First, she asserted a wrongful death claim under ORS 30.020 based on defendants' alleged medical negligence, specifically alleging, among other things, that the ER defendants had been negligent in examining decedent and assessing his condition, failing to obtain adequate imaging tests, and failing to diagnose and treat his cardiac condition; and that the Radiology defendants had been negligent in reviewing decedent's chest x-ray, failing to order additional imaging—including a CT scan—and failing to diagnose decedent's heart condition. Plaintiff further

---

[2]  According to evidence in the trial court record, an "aortic dissection" occurs when the aorta—the main artery carrying blood from the heart—tears and causes blood to leak out around the heart, compressing the heart until it stops beating.

alleged that defendants' negligence had caused decedent's death. Second, plaintiff separately asserted a lost chance claim under Oregon's survival statute, ORS 30.075, alleging that defendants' negligence had "caused [decedent] to suffer a loss of a chance at a better medical outcome that he would have been able to pursue as a negligence claim had he survived."

Before trial, on defendants' motion, the trial court dismissed plaintiff's lost chance claim; her wrongful death claim then proceeded to trial. At the close of evidence, over plaintiff's objection, the trial court included UCJI 44.03—which states that physicians "are not negligent merely because their efforts were unsuccessful" and that a physician "does not guarantee a good result by undertaking to perform a service"—in the instructions to the jury. The jury returned a verdict in defendants' favor, finding that the Radiology defendants were not negligent but that the ER defendants were negligent; however, it further found that their negligence was not a cause of damages to decedent.

As noted, the Court of Appeals reversed. That court concluded that (1) UCJI 44.03 was an incorrect statement of the law, and likely to mislead the jury; (2) that instructional error was not harmless; and (3) plaintiff's lost chance claim was viable under *Smith v. Providence Health & Services*, 361 Or 456, 393 P3d 1106 (2017), and Oregon's survival statute, ORS 30.075. *Martineau*, 320 Or App at 544, 547, 561-62.

## II.   ANALYSIS

The Court of Appeals opinion and the parties' briefing in this court addressed the jury instruction issue first before turning to the lost chance claim. Although that reverses the chronology of events—the trial court's dismissal of plaintiff's lost chance claim occurred before trial and the court instructed the jury at the end of trial—we follow suit and address the jury instruction issue first.

### A.   *UCJI 44.03*

We begin by setting out several principles that apply to jury instructions generally, as well as our standard of review on the UCJI 44.03 issue. The goal of jury

instructions is to "reduce the relevant law to terms readily grasped by the jury without doing violence to the applicable legal rule." *Rogers v. Meridian Park Hospital*, 307 Or 612, 616, 772 P2d 929 (1989). The wording of jury instructions, therefore, should be plain, clear, and simple. *Estate of Michelle Schwartz v. Phillip Morris Inc.*, 348 Or 442, 454, 235 P3d 668, *adh'd to on recons*, 349 Or 521, 246 P3d 479 (2010). Instructions that are misleading or confusing are grounds for reversal. *Id.* When reviewing a challenge to a trial court's decision to include a particular instruction, we read the instructions in their entirety to determine whether they state the law accurately. *State v. Woodman*, 341 Or 105, 118, 138 P3d 1 (2006).

In general, parties in a civil action are entitled to jury instructions on their theory of the case "if their requested instructions correctly state the law, are based on the current pleadings in the case, and are supported by evidence." *Purdy*, 355 Or at 227 (quoting *Hernandez v. Barbo Machinery Co.*, 327 Or 99, 105, 957 P2d 147 (1998) (internal quotation marks omitted)). In addition, as just noted, instructions must not be confusing or misleading. On review, plaintiff does not contend that UCJI 44.03 is not based on the pleadings in the case or that it is unsupported by the evidence. Instead, the only issues presented are whether that instruction is an incorrect statement of the law and whether it was confusing or misleading to the jury. We conclude that it was neither, in the context of this case.

Because UCJI 44.03 is a negligence instruction, and because we read a trial court's jury instructions in their entirety to determine whether they state the law accurately, we start by examining all the negligence instructions that the trial court provided to the jury. The trial court gave the jury the following instructions on negligence, ending with the UCJI 44.03 instruction:

"The law assumes that all persons, including physicians, have obeyed the law and have been free from negligence. The mere fact alone that a patient experienced an adverse outcome is not sufficient to prove negligence. It is, however, something you may consider along with other evidence.

"The plaintiff has made a claim for negligence against [d]efendants. This requires the plaintiff to prove each of the following by a preponderance of the evidence; that the defendants' conduct was negligent[,] and [that] the defendants' negligent conduct was the cause of harm to the plaintiff.

"Physicians who are specialists in a particular field of medicine have the duty to use that degree of care, skill, and diligence that is used by ordinar[il]y careful specialists practicing in the same medical field and the same or similar—and in the same or similar community. A failure to use such care, skill, or diligence is negligence.

"Physicians are not negligent merely because their efforts were unsuccessful. A physician does not guarantee a good result by undertaking to perform a service."

The first two paragraphs of those instructions are modeled on UCJI 20.01, concerning negligence and causation.[3] The third paragraph is taken from UCJI 44.02.[4] No party challenges those instructions. The last paragraph—the instruction that plaintiff contends is both inaccurate and confusing—is taken from UCJI 44.03, entitled "Professional Perfection Not Required."

The paragraph based on UCJI 44.03 has two sentences. The first sentence—"[p]hysicians are not negligent merely because their efforts were unsuccessful"—conveys essentially the same information to the jury as the first paragraph—"[t]he mere fact alone that a patient experienced an adverse outcome is not sufficient to prove

---

[3] UCJI 20.01 provides:

"The law assumes that all people have obeyed the law and have been free from negligence. The mere fact alone that an accident or injury occurred is not sufficient by itself to prove negligence. It is, however, something you may consider along with other evidence.

"The plaintiff has made a claim for negligence against the defendant. This requires the plaintiff to prove each of the following: (1) The defendant's conduct was negligent; (2) The defendant's negligent conduct was a cause of harm to the plaintiff; and (3) The harm was reasonably foreseeable."

[4] UCJI 44.02 provides:

"Physicians who are specialists in a particular field of medicine have the duty to use that degree of care, skill, and diligence that is used by ordinarily careful specialists practicing in the same medical field and in the same or a similar community. A failure to use such care, skill, or diligence is negligence."

negligence." The first paragraph, which is based on UCJI 20.01, was given to the jury in this case without objection. Plaintiff does not argue on review that there is any material difference between that statement and the first sentence of UCJI 44.03.

Thus, determining whether the trial court erred in giving the UCJI 44.03 instruction turns on whether the second sentence of that instruction—"[a] physician does not guarantee a good result by undertaking to perform a service"—is a correct statement of the law and was not confusing or misleading to the jury. We begin by observing that this court has stated that a physician is not "a guarantor of good results." *Clemens v. Smith*, 170 Or 400, 407, 134 P2d 424 (1943) (stating that it is a "well-recognized principle of law in malpractice cases" that a physician is not "a guarantor of good results"); *Hotelling v. Walther*, 169 Or 559, 562, 130 P2d 944 (1942) ("Dentists, like physicians and surgeons, are not guarantors of good results."). In addition, in many cases, this court has stated the same principle, using the word "cure" rather than "result." *See, e.g.*, *Mayor v. Dowsett*, 240 Or 196, 214, 400 P2d 234 (1965), *questioned on other grounds by Arrowood Indemnity Co. v. Fasching*, 369 Or 214, 503 P3d 1233 (2022) (stating that it is an "established principle that a physician is not *** a warrantor of cure" (internal quotation marks omitted)); *Eckleberry v. Kaiser Foundation et al.*, 226 Or 616, 626-27, 359 P2d 1090 (1961) ("It is the universal rule *** that a physician is not a warrantor of a cure."); *Crewse v. Munroe*, 224 Or 174, 177, 355 P2d 637 (1960) (physician is not warrantor of a cure); *Malila v. Meacham*, 187 Or 330, 354, 211 P2d 747 (1949), *abrogated in part by Rogers*, 307 Or at 615 ("It is well settled that a physician or dentist is not a warrantor of cures[.]"); *Hamilton v. Kelsey*, 126 Or 26, 29, 268 P 750 (1928) (physician's undertaking to treat a patient "is not an absolute one to cure, not to restore a condition of good health," nor is the physician "an insurer of the efficacy of his services").[5]

---

[5] Courts in other jurisdictions have approved instructions using similar terms. *See, e.g.*, *Lange v. Schultz*, 627 F2d 122, 127 n 4 (8th Cir 1980) (approving instruction stating that "the doctor is not a guarantor of a good result"); *Smith v. Koslow*, 757 NW2d 677, 679, 681 (Iowa 2008), *overruled on other grounds by Alcala v. Marriott Intern, Inc.*, 880 NW2d 699 (Iowa 2016) (approving instruction stating that "[t]he mere fact that a party was injured does not mean that a party

Notwithstanding those broad pronouncements, plaintiff argues, and the Court of Appeals held, that the second sentence of UCJI 44.03 is misleading or incorrect because the word "result" can sometimes mean something other than the ultimate outcome for a patient. That is, plaintiff argues, a physician effectively "guarantees" the avoidance of injuries that would not occur in the absence of negligence, and a "result" therefore includes actions that a physician would be compelled to take to comply with the standard of care, such as ordering or conducting tests that might disclose something crucial about the patient's condition. Thus, in plaintiff's view, by stating that a physician "does not guarantee a good result," UCJI 44.03 improperly suggests to the jury that substandard care might be permissible.

We disagree with that understanding of the word "result" in the context of a physician undertaking to provide medical services to a patient. The dictionary defines "result" to mean anything "that results as a consequence, effect, issue, or conclusion." *Webster's Third New Int'l Dictionary* 1937 (unabridged ed 2002). Thus, the plain meaning of the word "result"—applied in this context—suggests a consequence or outcome for the patient. Understanding "result" to refer to the consequences or outcome for the patient is consistent with how this court has used that word in medical negligence cases.

_____

was negligent"); *Sennert v. McKay*, 56 SW2d 105, 106-07 (Mo 1932) (approving instruction stating that "the defendant is not an insurer of a good result when undertaking the treatment of a case"); *Miller v. Defiance Regional Med. Ctr.*, No L-06-1111, 2013 WL 4563473 at *10 (Ohio Ct App, Dec 31, 2007) (approving instructions stating that "[t]he fact that the doctor's treatment did not bring about a cure, or fulfill the patient's expectations, does not, by itself prove that the doctor was negligent" and that "[a] physician does not guarantee that his care and treatment of a patient will always be successful, nor does a physician promise that nothing serious will result thereof"); *Rooney v. Medical Center Hosp. of Vermont*, 162 Vt 513, 522, 649 A2d 756, 761 (Vt 1994) (approving instruction stating that a doctor does not "guarantee a good result"); *Christensen v. Munsen*, 123 Wash 2d 234, 247-48, 867 P2d 626, 633 (1994) (approving instruction stating that "[a]n ophthalmologist does not guarantee the results of his or her care and treatment" and that "[a] poor medical result is not, in itself, evidence of negligence"); *Nowatske v. Osterloh*, 198 Wis 2d 419, 443-44, 543 NW2d 265, 274 (1996), *abrogated on other grounds by Nommensen v. American Continental Ins. Co.*, 246 Wis 2d 132, 629 NW2d 301 (2001) (approving instruction stating that "[a] physician does not guarantee the results of his care and treatment").

As we have noted, in other medical malpractice cases, the court has approved the same principle—a physician is not a guarantor of a good result—using the word "cure" rather than "result." Depending on the context, then, the word "result" as used in UCJI 44.03 may or may not be different from a "cure," but those cases show that we have always treated the "result" in a medical negligence case as referring to the consequences or outcome for a patient, not the steps that a physician may or even should take in assessing and treating a patient. A physician's evaluation, examination, and diagnosis of a patient are not "results" in and of themselves. The standard of care may require a physician to order a CT scan, for example, but the CT scan itself is not a "result," nor is the decision to order—or not to order—a CT scan a result. Rather, a CT scan is a tool to generate information that a physician uses to further assess and treat the patient. If that assessment and treatment had been successful in this case, then the "result" may have been that the decedent would have survived.

As we have stated, we consider a trial court's instructions in their entirety to determine whether they stated the law accurately. The trial court below gave defendants' requested UCJI 44.03 instruction immediately after instructing the jury that "[t]he mere fact alone that a patient experienced an adverse outcome is not sufficient to prove negligence" and that a physician is negligent if the physician fails to use "that degree of care, skill, and diligence that is used by ordinar[il]y careful specialists practicing in the same medical field and the same or similar community." When viewed together, the instructions as a whole in the context of this case—which involved the worst possible outcome for the patient—appropriately told the jury that it must look to the standard of care, not the bad result, in determining whether defendants were negligent.[6]

---

[6] We acknowledge that, in some circumstances, instructing the jury that a physician "does not guarantee a good result by undertaking to perform a service" may not be very useful to the jury. For example, in some cases, the "result"—the consequences or outcome for the patient—may be in dispute. In addition, some physicians perform limited services as part of a medical team's assessment and treatment of a patient. In that context, the "result" of the physician's services could be understood to mean that the physician finished providing services to the patient. If the physician failed to meet the standard of care in performing those

The jury's findings in this case—that the ER defendants had been negligent, but the Radiology defendants had *not* been negligent—supports that conclusion. If the jury thought that substandard care was permissible because the physicians did not guarantee a good result, then the jury might have found that *neither* set of defendants had been negligent. The finding that the ER defendants had been negligent, but the Radiology defendants had not, suggests that the jury appropriately based its findings on the evidence relating to each set of defendants' alleged failures to meet the standard of care, and not on whether substandard care might have been permissible because physicians do not guarantee a good result.

Plaintiff contends, and the Court of Appeals also reasoned, that UCJI 44.03 is comparable to the "error-of-judgment" instruction that we determined was confusing and incorrect in *Rogers*. 307 Or at 619-20. We disagree. The instruction at issue in *Rogers* provided as follows:

> "'[1] A physician is charged with applying without error those principles and learnings that are settled and agreed upon by all members of the medical profession. [2] In some cases, there may be reasonable differences of opinion among members of the medical profession as to the nature of the patient's condition or the proper course of treatment. [3] When there is such a difference of opinion, the physician must exercise reasonable judgment. [4] A physician is liable for an error of judgment if the physician fails to act with reasonable care and skill in exercising that judgment. [5] A physician is not liable for an error in judgment if the physician acts with reasonable care and skill in exercising such judgment.'"

*Id.* at 615 (quoting instruction (brackets in *Rogers*)).

We concluded that that instruction was confusing and incorrect for several reasons. First, this court had noted prior criticism of the instruction dating back to the 1930s—with no case from this court addressing the instruction

---

services, the physician could be liable for medical negligence if the physician's failure to meet the standard of care was a cause of harm to the patient. The word "result" under those circumstance could be understood to refer to both the completion of the physician's negligent services and the harmful consequences for the patient.

since that time—and a more recent case from the Court of Appeals had found the instruction "wanting." *Id.* at 617 (citing *King v. Ditto*, 142 Or 207, 218, 19 P2d 1100 (1933) (noting the criticism), and *Ellis v. Springfield Women's Clinic*, 67 Or App 359, 361, 678 P2d 268, *rev den*, 297 Or 228 (1984) (finding the instruction wanting)). Second, we observed that courts in other jurisdictions had disapproved of the error-of-judgment instruction. *Rogers*, 307 Or at 618. Finally, a sentence-by-sentence analysis of the instruction revealed that the wording suggested "that substandard conduct is permissible if it is garbed as an 'exercise of judgment.'" *Id.* at 620.

UCJI 44.03 shares none of the characteristics that led us to conclude in *Rogers* that the "error-of-judgment" instruction was flawed. Aside from the Court of Appeals' decision in this case, no Oregon appellate court has criticized UCJI 44.03 in a medical negligence case. And, as noted earlier, courts in other jurisdictions have been *approving* instructions comparable to UCJI 44.03. Finally, as discussed above, our analysis of each sentence of UCJI 44.03 demonstrates that the instruction was not inaccurate or confusing in the context of this case.

The concurring opinion states that instructing the jury that a physician does not guarantee a good result "obscures the standard of care," 371 Or at 279 (Flynn, C. J., concurring in part and concurring in the judgment), reasoning that, because (1) a physician "guarantees" to meet the standard of care; and (2) complying with the standard of care may ensure a "good result"; therefore, (3) the physician sometimes guarantees a good result, *id.* at 282. That reasoning overlooks the fact that UCJI 44.03 states that a physician does not guarantee a good result *by undertaking to perform a service*—that is, by simply agreeing to treat a patient, a physician does not promise or guarantee a particular outcome for the patient. Moreover, meeting the standard of care might make a good result *more likely*, but it does not guarantee a good result for the patient. There are no "guaranteed" outcomes in medicine; there is only a requirement that physicians meet the standard of care in evaluating and treating their patients.

We conclude that UCJI 44.03 was not an incorrect statement of the law in this case and that it would not have been confusing to the jury.[7] Therefore, the trial court did not err in giving that instruction to the jury.[8]

B.   *Lost Chance Claim*

We turn to the trial court's pretrial decision to grant defendants' motion to dismiss plaintiff's "lost chance" claim, which, as noted, she had asserted separately from her wrongful death claim.[9] Plaintiff's complaint grounded her lost chance claim in Oregon's survival statute, ORS 30.075, which provides in subsection (1) that the personal representative of a decedent may maintain an action on the decedent's behalf "if the decedent might have maintained an action, had the decedent lived, against the wrongdoer for an injury done." In reversing the court's dismissal of that claim, the Court of Appeals concluded that plaintiff's lost chance claim was cognizable under ORS 30.075(1) and this court's decision in *Smith*. *Martineau*, 320 Or App at 561-62. On review in this court, defendants contend that ORS 30.075(1) does not apply where a personal representative alleges that a defendant's negligent conduct caused the decedent's *death*—as opposed to merely causing an *injury*. Under those circumstances, defendants continue, any lost chance claim is essentially subsumed within plaintiff's wrongful death action brought under ORS 30.020, which, they argue, provides the exclusive remedy for an action seeking damages from a wrongdoer who allegedly caused a decedent's death.

Defendants' contention raises a question of statutory interpretation, to which we apply our traditional

_____

[7] Based on that conclusion, we need not address whether any instructional error was harmless.

[8] Our decision is limited to the use of UCJI 44.03 in this case. We note that the Uniform Civil Jury Instruction Committee withdrew UCJI 44.03 after the Court of Appeals' decision in this case. We express no opinion on the committee's decision. However, as we have noted, the first sentence of UCJI 44.03 is duplicative of another uniform instruction. And as we also have noted, in other circumstances not presented here, the second sentence of the instruction might not be very useful to the jury.

[9] As explained more fully below, in a medical malpractice action, a lost chance claim (or "loss-of-chance" claim) alleges that a defendant's negligence caused the plaintiff to lose the chance of a favorable medical outcome.

methodology. *See, e.g.*, *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009) (court gives primary weight to statutory text in context, with appropriate additional weight accorded to any relevant legislative history); *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993) (context includes other provisions of the same statute and other related statutes); *SAIF v. Walker*, 330 Or 102, 109, 996 P2d 979 (2000) (context also includes case law interpreting the statute at issue and related statutes, including earlier versions of those statutes). In applying that methodology, we attempt to discern the intent of the legislatures that enacted the statutes. ORS 174.020; *State v. McDowell*, 352 Or 27, 30, 279 P3d 198 (2012).

    1.   *Statutory text and context*

        We begin with the text of the two key statutes at issue—ORS 30.020(1), which provides the basis for a wrongful death action, and ORS 30.075(1), which sets out the basis for a survival action.

        Subsection (1) of ORS 30.020 applies when a person's "death" was caused by another person's wrongful act or omission. It provides, in part:

> "When the death of a person is caused by the wrongful act or omission of another, the personal representative of the decedent * * * may maintain an action against the wrongdoer, if the decedent might have maintained an action, had the decedent lived, against the wrongdoer for an injury done by the same act or omission."

Subsection (2) describes two types of damages that are generally recoverable in a wrongful death action: damages to compensate the decedent's estate and close family members[10] for their economic and noneconomic losses—for example, the cost of memorial and burial services, pecuniary losses to the estate, and compensation for the family's loss of the society, companionship, and services of the decedent—and damages to compensate for the decedent's own economic and noneconomic losses suffered during the period

---

[10] The family members that could receive compensation under the statute are the decedent's spouse, children, stepchildren, stepparents, and parents. ORS 30.020(2)(d).

between the time of the wrongful conduct causing injury and the decedent's death. ORS 30.020(2)(a)‑(e); *see also* ORS 31.705(2) (defining economic and noneconomic damages).[11] That second category of damages includes an amount that would "justly, fairly and reasonably have compensated the decedent for disability, pain, suffering and loss of income during the period between injury to the decedent and the decedent's death." ORS 30.020(2)(b).

ORS 30.075, referred to as the survival statute, applies when a person suffers "injuries" allegedly caused by a defendant's wrongful acts or omissions. Subsection (1) of that statute provides, in part:

> "Causes of action arising out of injuries to a person, caused by the wrongful act or omission of another, shall not abate upon the death of the injured person, and the personal representatives of the decedent may maintain an action against the wrongdoer, if the decedent might have maintained an action, had the decedent lived, against the wrongdoer for an injury done by the same act or omission."

We first note that the survival statute, at the outset, refers to "causes of action" arising out of injuries to a person caused by another, whereas the wrongful death statute refers to maintenance of "an action."[12] That disparity is noteworthy, because, under the Oregon Rules of Civil Procedure, an "action" may include one or more "causes of action" or

---

[11] The wrongful death statute describes the types of damages recoverable during the period between the wrongful conduct and the decedent's death to include "reasonable charges necessarily incurred for doctors' services, hospital services, nursing services, [and] other medical services *** rendered for the decedent" (ORS 30.020(2)(a)); and an amount which "[w]ould justly, fairly and reasonably have compensated the decedent for disability, pain, suffering and loss of income during the period between injury to the decedent and the decedent's death[.]" ORS 30.020(2)(b). Charges for medical services and compensation for loss of income would be included in "economic damages" as defined in ORS 31.705(2)(a), while the other categories of damages would be treated as "noneconomic damages" as defined in ORS 31.705(2)(b). For ease of reference, we use the terms "economic damages" and "noneconomic damages" to describe the types of damages recoverable under ORS 30.020(2) to compensate decedent for losses during the period between the wrongful conduct and the decedent's death.

[12] As discussed below, although the survival statute refers, at the outset, to "causes of action," it later states that the personal representative "may maintain an action" against the wrongdoer if the decedent "might have maintained an action" against the wrongdoer for the same act or omission if the decedent had lived. ORS 30.075(1).

"claims." *See Peterson v. Temple*, 323 Or 322, 327 n 3, 918 P2d 413 (1996) (stating that the terms "cause of action" and "claim" are synonymous); *Troutman v. Erlandson*, 287 Or 187, 201, 598 P2d 1211 (1979) (stating that "claim" or "cause of action" means "a group of facts which entitled plaintiff to relief"). More specifically, there is "one form of action known as a civil action," ORCP 2, generally commenced by filing a complaint, ORCP 3, which is a pleading that must separately state "[e]ach separate claim[.]" ORCP 13 B; ORCP 16 C. "Claims," in turn, may be alleged "in the alternative," ORCP 16 D; each claim must contain a "plain and concise statement of the ultimate facts constituting a claim for relief," ORCP 18 A; and a plaintiff "may join in a complaint *** as many claims *** as the plaintiff has against an opposing party," ORCP 24 A. *See also Peterson*, 323 Or at 327 n 3 (noting that the Oregon Rules of Civil Procedure "abandon[ed] the common law terms 'cause of action' and 'cause of suit' in favor of the term 'claim for relief' *** or some variant of that term").

Thus, the wrongful death statute, ORS 30.020(1), authorizes the personal representative of a decedent to "maintain an action" against the wrongdoer when the decedent's death was caused by the wrongdoer's wrongful act or omission, but it does not expressly mention the types of "claims" or "causes of action" that can be brought in a wrongful death action. The survival statute, ORS 30.075(1), by contrast, refers to "causes of action"—or claims—arising out of a person's injuries caused by a defendant's wrongful acts or omissions, and it precludes abatement of those survival statute "causes of action" upon the death of the injured person.

The statutory damages provisions—or lack thereof—are also informative. As noted above, the wrongful death statute describes the types of damages recoverable in a wrongful death action, ORS 30.020(2), but the survival statute does not specify the types of damages that may be recoverable in a survival cause of action. However, the survival statute does state that, if a wrongful death action is brought, then any damages to compensate the decedent for "disability, pain, suffering and loss of income during the period between injury to the decedent and the resulting

death of the decedent *may only be recovered in the wrongful death action*[.]" ORS 30.075(3) (emphasis added).

Thus, a personal representative bringing a wrongful death *action* alleging that a defendant's wrongful conduct caused a decedent's death can assert a *claim* to recover economic and noneconomic damages suffered by the decedent during the period between the wrongful conduct that caused the injury and the decedent's subsequent death only in the wrongful death *action*. The issue, then, is whether a lost chance survival claim is among the types of claims that can be brought in a wrongful death action or instead—as defendants contend—such a claim is precluded where the personal representative alleges that a defendant's wrongful conduct caused the decedent's death.

In addressing that issue, the parties point out that both statutes authorize a personal representative to "maintain an action" against a wrongdoer "if the decedent might have maintained an action, had the decedent lived, against the wrongdoer for an injury done by the same act or omission." ORS 30.020(1); ORS 30.075(1). Plaintiff contends that that wording in the survival statute authorizes her to bring a lost chance survival claim because the injury that she alleged—that decedent had suffered "a loss of a chance at a better medical outcome that he would have been able to pursue as a negligence claim had he survived"—is a viable survival claim under ORS 30.075. Defendants counter that decedent's "lost chance" in the context of this case can mean only that he lost the chance of surviving, instead of dying, and that such a claim cannot be brought under the survival statute because it is an inherent part of plaintiff's wrongful death claim.

Both parties overlook the fact that the wrongful death statute addresses "actions," not "claims," as explained above. Relatedly, and as we explain next, nothing in the text of ORS 30.020 and ORS 30.075 necessarily precludes a personal representative from bringing—in a wrongful death *action*—a lost chance injury *claim* in addition or as an alternative to a wrongful death claim. However, as we also explain below, a personal representative cannot bring such a claim under the survival statute.

We begin by framing a hypothetical question posed by the text of the disputed provision in both statutes: If the decedent had lived, could he have "maintained an action" against defendants for "an injury done"? Because the focus of that text is on the nature of the action alleged, not on whether the decedent died, the question here is more clearly stated as whether—if decedent had lived but had suffered injuries caused by defendants' allegedly negligent conduct—could he have brought a personal injury action (here, alleging medical negligence) against defendants? Under both statutes, the answer to that hypothetical question is clearly "yes."

That, in turn, poses a further question: Assuming that the decedent could have maintained a personal injury action under both statutes had the decedent lived, can a personal representative bring an injury action after the decedent dies, and if so, can it be brought as a claim under the wrongful death statute, ORS 30.020(1), or the survival statute, ORS 30.075(1), or both? The resolution of that question depends on the allegations in the complaint. ORS 30.020(1) applies where a plaintiff alleges that a decedent's *death* had been caused by the wrongful acts or omissions of another, whereas ORS 30.075(1) applies where a plaintiff alleges that a decedent's *injuries*—but not the decedent's death— had been caused by the wrongful acts or omissions of another.

That brings us to the key textual dispute raised by the parties' arguments: whether a personal representative may bring a lost chance claim under the survival statute, ORS 30.075, when the personal representative alleges that the *same* wrongful acts or omissions alleged to have caused the injury are also alleged to have caused a decedent's death, thereby authorizing the personal representative to bring a wrongful death action under ORS 30.020(1).

Defendants contend that ORS 30.075(3)—which describes when a prevailing party attorney fee award is precluded in a survival action—demonstrates that a lost chance injury claim under the survival statute cannot be brought in the wrongful death action. That subsection provides:

"Subsection (2) of this section [permitting a reasonable attorney fee award to the prevailing party in a survival action under ORS 30.075(1)] does not apply to an action for damages *arising out of injuries that result in death. If an action for wrongful death under ORS 30.020 is brought, recovery of damages for disability, pain, suffering and loss of income during the period between injury to the decedent and the resulting death of the decedent may only be recovered in the wrongful death action*, and the provisions of subsection (2) of this section are not applicable to the recovery."

(Emphasis added.) Defendants contend that the emphasized text supports their proposition that, where the defendants' wrongful acts or omissions are alleged to have caused an injury that, in turn, led to the decedent's death, the personal representative cannot bring an injury claim—such as plaintiff's lost chance claim—under the survival statute as an alternative to a wrongful death claim.

We do not read that provision to mean, as a categorical matter, that an injury claim is always precluded when a personal representative alleges that a defendant's wrongful conduct caused the decedent's death. Rather, the text of subsection (3) of ORS 30.075 suggests two outcomes: (1) that economic and noneconomic damages to compensate for the decedent's losses during the period between injury and death are recoverable in the wrongful death action only; and (2) that a personal representative seeking to recover such damages in the wrongful death action is not entitled to recover attorney fees that otherwise would be recoverable in a survival action under ORS 30.075(2).

As a textual matter, the statutes do not appear to preclude a personal representative—who alleges that a defendant's wrongful conduct had caused the decedent's death—from bringing an alternative lost chance injury claim to recover economic and noneconomic damages incurred by the decedent during the period between a defendant's wrongful conduct and the decedent's death. However, the statutes do appear to require that such a claim can only be brought in the wrongful death action. We turn to the historical context and case law, to further consider the statutory interpretation questions.

### 2.  *Historical context and case law*

The historical context and case law make it clear that the difference between claims under the wrongful death and survival statutes turns on whether the wrongful conduct is alleged to have caused the decedent's death. At common law, an action for bodily injury abated upon the death of the injured party. *Mendez v. Walker*, 272 Or 602, 603-04, 538 P2d 939 (1975). As a result, such causes of action continued "only to the extent the common law has been modified by statute." *Id.* at 604. The Oregon legislature enacted our state's first wrongful death statute in 1862. General Laws of Oregon, Civ Code, ch IV, title VI, § 367, p 187 (Deady 1845-1864). In *Hughes v. PeaceHealth*, 344 Or 142, 147, 156, 178 P3d 225 (2008), this court recognized that the 1862 statute "defin[ed] the action *** on a clean slate," observing that "wrongful death is an entirely statutory cause of action and has no basis in the common law." The 1862 statute provided that a wrongful death action belonged to the deceased person's personal representative and that the cause of action was for "injury done by the same act or omission that would have supported an action by the deceased, had he or she lived[.]" General Laws of Oregon, Civ Code, ch IV, title VI, § 367, p 187 (Deady 1845-1864).

The purpose of the wrongful death statute is to "remove death as a bar to bringing the claim, not to make death the central event of the action." *Howell v. Willamette Urology, P.C.*, 344 Or 124, 129, 178 P3d 220 (2008). In *Howell*, we noted that that reading of Oregon's current wrongful death statute, ORS 30.020, was "confirmed by" a sentence in subsection (1), which provides that a wrongful death action "shall be commenced within three years *after the injury causing the death of the decedent* is discovered or reasonably should have been discovered by the decedent, by the personal representative or by a person for whose benefit the [wrongful death] action may be brought." *Id.* (emphasis added; brackets in *Howell*). That part of the statute, we explained, recognizes that a wrongful death action asserted under ORS 30.020(1) may arise for statute of limitations purposes while the decedent is still alive. *Id.*

In *Howell*, the claim at issue was the plaintiff's claim that the defendant's negligence "allegedly caused decedent's death." *Id.* at 126. *Howell* recognized that, under the wrongful death statute, such a claim could arise as an injury claim before the decedent's death. *Id.* at 129. Although that set of facts was not presented in *Howell*, if a defendant's wrongful conduct caused an injury resulting in a claim, and the decedent later died as a result of the alleged wrongful conduct while the claim was pending, the wrongful death statute provides that the decedent's personal representative may maintain a wrongful death action "if the decedent might have maintained an action, had the decedent lived, against the wrongdoer for an injury done by the same act or omission." ORS 30.020(1). Procedurally, the personal representative would be substituted for the decedent as the named plaintiff pursuant to ORCP 34.[13]

In 1965—more than 80 years after the enactment of Oregon's first wrongful death statute—the legislature enacted the survival statute, ORS 30.075. Or Laws 1965, ch 620, § 4. Before the 1965 enactment, *former* ORS 121.010 (1963), *repealed by* Or Laws 1965, ch 620, § 1, had provided that "'[a] cause of action arising out of an injury to the person dies with the person.'" *Bell v. Tri-Met*, 353 Or 535, 542, 301 P3d 901 (2013) (quoting *former* ORS 120.010 (1963) (brackets in *Bell*)). The statutorily mandated "death" of an injury claim had been subject to a few exceptions, including wrongful death actions, actions related to the injury of a child, and actions that achieved a verdict before the party's death. *Id.* at 542-43 (citing statute); *see also id.* at 552-53 (Baldwin, J., dissenting) (describing statutory exceptions and noting that *former* ORS 121.010 (1963) operated "to preclude any representative from continuing or bringing a personal injury cause of action on behalf of a deceased person").

Thus, under the law that existed before ORS 30.075(1) was enacted in 1965, a personal representative alleging that a defendant's wrongful acts or omissions had

---

[13] Under ORCP 34 A, an injury claim does not "abate" when the plaintiff dies. Instead, under ORCP 34 B, the court "shall" allow the action to be continued by the decedent's personal representative if the personal representative files a motion for substitution as plaintiff within one year after the decedent's death.

caused the decedent's death *could* bring a wrongful death action, but a personal representative alleging that a defendant's wrongful acts or omissions had caused the decedent's injuries—but not death—*could not* bring or continue a personal injury action. Then, the 1965 enactment of ORS 30.075 ended the prohibition on bringing or continuing a personal injury action after the injured person's death, by repealing *former* ORS 121.010 (1963). *Bell*, 353 Or at 543.

*Bell* highlights the functional difference between a wrongful death action under ORS 30.020(1) and a survival action under ORS 30.075(1). The decedent in *Bell* was injured while disembarking from a bus. A year later, the decedent died "from causes unrelated to the bus accident." *Id.* at 537. And a year after that, the decedent's personal representative brought a negligence action against the defendant (the transportation district that had operated the bus). The injury claim in *Bell* was brought under the survival statute, ORS 30.075(1), and not under the wrongful death statute, ORS 30.020(1). *Id.*

The issue in *Bell* was whether the personal representative's claim was time-barred by a two-year statute of limitations. In holding that the claim was barred, the court noted that, for both a wrongful death action and a survival action, "the legislature has created rights and liabilities that did not previously exist in statute or at common law." *Id.* at 545-46. The court explained that both statutes served the same purpose—to remove death as a bar to bringing the claim—but in different contexts. *Id.* at 546. Where the defendant's wrongful conduct is alleged to have caused a person's death, as in *Howell*, the action may be brought as a wrongful death action under ORS 30.020(1). Where the defendant's wrongful conduct is alleged to have caused a person's injury, but not the person's death, as in *Bell*, the action may be brought or continued after the injured person's death as a survival action under ORS 30.075(1). *See id.* at 543 (noting that, by enacting ORS 30.075(1) and simultaneously repealing *former* ORS 121.010 (1963), the legislature "created new rights and liabilities arising from personal injury where an injured person dies before or after commencing an action").

With that understanding of the statutes, we turn to an examination of two cases addressed by both parties— *Joshi v. Providence Health System*, 342 Or 152, 149 P3d 1164 (2006), and *Smith*. Defendants contend that *Joshi* precludes plaintiff from bringing her lost chance claim, while plaintiff contends that *Smith* allows her to bring the claim as a survival claim. As we will explain, neither case fully resolves the issue presented in this case.

The plaintiff in *Joshi* brought a wrongful death action against multiple health care providers, alleging that they had failed to timely diagnose and treat her husband's stroke with appropriate medications, leading to his death. The decedent had arrived at the hospital by ambulance, complaining of severe headache, blurred vision, and dizziness, but was discharged with a prescription for pain medication. He continued to experience vision problems and disorientation and was transported back to the hospital four days after his original discharge. That time, the hospital personnel determined that he had suffered a stroke. Treatment was unsuccessful, and he died two days later. 342 Or at 155-56.

At trial, the plaintiff's medical expert testified that timely administration of appropriate medications would have increased the decedent's chance of survival by, at most, 30 percent. *Id.* at 156. Reasoning that the plaintiff therefore could not prove that the defendant's conduct, more likely than not, had caused the decedent's death, the trial court directed a verdict in the defendants' favor, and the Court of Appeals affirmed. *Id.* We allowed review to address two related issues: (1) the standard of causation that applied; and (2) whether expert testimony that the defendants' conduct probably increased the chance of the decedent's death created a jury question as to causation. *Id.* at 157.

In construing the wrongful death statute, ORS 30.020, we resolved the first issue by applying a "reasonable probability" standard to the statutory word "caused," concluding that a wrongful death plaintiff must "demonstrate that the defendant's negligent act or omission more likely than not brought about the death of the decedent." *Id.* at 159. On the second issue, we explained that, "[a]lthough deprivation of a 30 percent chance of survival may constitute an

injury, the injury that is compensable under ORS 30.020 is death." *Id.* at 164. We therefore affirmed the directed verdict in the defendants' favor, holding that the plaintiff had "failed to prove the elements of the wrongful death action." *Id.*

Defendants contend that our decision in *Joshi* precludes a lost chance claim under the survival statute, ORS 30.075(1), when the plaintiff alleges that a defendant's medical negligence caused the decedent's death. In that situation, according to defendants, the statutory wrongful death action authorized by ORS 30.020 provides the plaintiff's exclusive remedy. But *Joshi* did not address whether a lost chance claim could be brought under Oregon's survival statute as an alternative or in addition to a wrongful death claim. Indeed, at the time when *Joshi* was decided, we had not yet determined whether a lost chance claim was cognizable in Oregon under any circumstance. That issue was presented eleven years later in *Smith*, to which we now turn.

The plaintiff in *Smith* went to the emergency room after he began experiencing visual difficulties, confusion, slurred speech, and a headache, with concerns that he might be having a stroke. The defendant doctors examined the plaintiff, ordered a CT scan, and eventually discharged him from the hospital without advising him to take aspirin. A week later, an MRI showed that the plaintiff had suffered substantial brain damage from a stroke, causing permanent impairment. *Smith*, 361 Or at 458-59.

The plaintiff brought a common-law medical negligence action, alleging that, as a result of the defendants' negligent failure to conduct a thorough neurological examination, order an MRI on an expedited basis, and start the plaintiff on aspirin, the plaintiff had "'lost a chance for treatment which, 33 percent of the time, provides a much better outcome, with reduced or no stroke symptoms.'" *Id.* at 460 (quoting complaint). The plaintiff further alleged that he had suffered "'serious and permanent injuries'" and "'lost his ability to work.'" *Id.* He sought to recover damages for lost wages, impairment of earning capacity, and noneconomic damages. *Id.* The trial court granted the defendants'

motion to dismiss, but we reversed that ruling. *Id.* at 461, 485.

We first addressed whether our decision in *Joshi* had "already resolved the question whether a loss of chance is cognizable under Oregon law[.]" *Id.* at 463. On that question, we agreed with the plaintiff, stating that we had not yet decided "whether an injured plaintiff alleging common-law medical malpractice may recover for loss of a chance at a better medical outcome." *Id.* We explained that "[t]he feature distinguishing *Joshi* from [*Smith*] is the wrongful death statute, ORS 30.020," which was "at the heart of" *Joshi*. *Id.* Thus, we treated the question of whether a plaintiff could bring a lost chance claim as "an issue of first impression" in Oregon. *Id.* at 466.

Next, we reviewed the development of the lost chance theory in medical malpractice actions, "to provide context for our analysis of whether and how [a] plaintiff may use that theory." *Id.* at 467. We noted that some jurisdictions had characterized lost chance theories of recovery, in the medical malpractice context, as involving a "relaxation of the causation standard." *Id.* at 469. But we further noted that commentators and a majority of courts in the jurisdictions that had approved the lost chance doctrine had favored an "injury-based analytical approach." *Id.* But then, we continued, a significant number of states instead had continued to adhere to a traditional "all-or-nothing" approach that "requires the plaintiff to establish that the patient would have had a better than 50 percent chance of survival or a favorable outcome, which then triggers a right to recover all damages resulting from the defendant's malpractice." *Id.* at 472.

Ultimately, we concluded in *Smith* that, in common-law negligence cases involving medical malpractice, Oregon should recognize "a limited loss-of-chance theory of recovery." *Id.* at 482. We explained that the causation element of a medical negligence cause of action "can apply to the loss of chance when [the lost chance] is understood as an injury." *Id.* at 479. In other words, when the injury in a medical malpractice action is the lost chance, the plaintiff may allege a lost chance claim, which then requires the plaintiff to prove

"more likely than not, [that] the defendant's negligence caused the plaintiff to lose the chance of a favorable medical outcome." *Id.*

We further explained in *Smith* that, to state a lost chance claim, "a plaintiff must plead the percentage and quality of [the] loss of chance, which in turn must be based on [both] the plaintiff's experts and relevant scientific evidence that meets the standard of reasonable medical probability." *Id.* at 483. The plaintiff's pleading in *Smith* met that requirement, because the plaintiff had "alleged the loss of a substantial chance by alleging a 33 percent chance of total or close to total recovery from his stroke had defendants provided him with non-negligent care." *Id.* To prevail on that claim, the plaintiff would have needed to prove that the defendants' negligence more likely than not caused him to lose the opportunity for treatment that, 33 percent of the time, would have resulted in his recovery with reduced or no stroke symptoms.

Because the plaintiff in *Smith* had survived, there was no reason to address whether a lost chance claim could be brought under the survival statute, ORS 30.075, as an alternative or in addition to a wrongful death claim under ORS 30.020. That case, then, like *Joshi*, does not resolve the parties' dispute in this case, though it does help to understand the parameters of a properly alleged lost chance claim when the injured person was not deceased.

We next turn to the relevant legislative history of ORS 30.020 and, more particularly, ORS 30.075, to determine whether that history sheds any additional light on the legislature's intent.

### 3.  *Legislative history*

The legislative history confirms that the legislature did not intend to allow a plaintiff to recover attorney fees in a wrongful death action by bringing a survival claim in that action. As noted in *Bell*, 353 Or at 542, ORS 30.075 was enacted in 1965 through House Bill (HB) 1517 (1965). Unfortunately, very little legislative history about the initial enactment of that bill is available. The minutes show that an attorney who had drafted the bill, at the request of a

representative, stated that the bill was designed to allow the survival of a cause of action after the death of the injured person. Minutes, House Committee on Judiciary, Mar 30, 1965, 2 (statement of Tom Thorpe).

In 1995, the legislature modified subsection (2) of ORS 30.075—the prevailing party attorney fee provision— and added subsection (3)—the exception to the attorney fee provision—to the statute. Senate Bill (SB) 385 (1995); Or Laws 1995, ch 618, § 21. During the development of those amendments, the counsel to the Senate Judiciary Civil Process Committee stated that then-proposed subsection (3) addressed "*the problem that apparently is ongoing* with that statute that deals with people *trying to attach the survival statute to wrongful death statutes.*" Tape Recording, Senate Committee on Judiciary, Subcommittee on Civil Process, SB 385, Apr 24, 1995, Tape 43, Side B (statement of Committee Counsel Max Williams) (emphases added). During a later hearing, counsel stated:

> "We've inserted new language with respect to the issue involving survival statutes. You'll see \*\*\* a new subsection [(3)] has been added and makes clear that the subsection does not apply to any action for damages arising out of injuries that result in death. \*\*\* This was to resolve the problem that exists where \*\*\* actions under the survival statute are being brought in conjunction with wrongful death claims as a means of recovering attorney fees. The language of this third paragraph here resolves that problem."

Tape Recording, Senate Committee on Judiciary, Subcommittee on Civil Process, SB 385, May 1, 1995, Tape 44, Side A (statement of Committee Counsel Williams). Committee Counsel continued, stating that "[t]he idea [of adding subsection (3)] is \*\*\* to break the practice of trying to plead a survival statute case with a wrongful death case as a means of recovering attorney fees." *Id*.

The legislative history of Oregon's original wrongful death statute—which, as noted above, was enacted in 1862—is not available. Somewhat more recently, though, a 1995 amendment to ORS 30.020 in SB 385—the same bill that added subsection (3) to ORS 30.075—removed a subsection from ORS 30.020 that had provided as follows:

"(3) The court shall reduce recovery under this section by the amount of recovery, if any, by the decedent or the decedent's personal representative under ORS 30.075 because of the act or omission which caused the decedent's death." The same committee's counsel explained that that change was made "to match up" ORS 30.020 with the amendments made to ORS 30.075. Tape Recording, Senate Committee on Judiciary, Subcommittee on Civil Process, SB 385, May 1, 1995, Tape 44, Side A (statement of Committee Counsel Williams).

The combined effect of the 1995 amendments to the survival statute and the wrongful death statute—adding subsection (3) to ORS 30.075 and deleting the prior reference to the survival statute from ORS 30.020—suggests that the legislature did not intend for plaintiffs to continue bringing claims under the survival statute, ORS 30.075, in order to recover attorney fees when bringing a wrongful death action under ORS 30.020, alleging that the defendant's wrongful conduct had caused the decedent's death.

4. *Summary*

In sum, the text, context, case law, and available legislative history of the wrongful death statute, ORS 30.020, and the survival statute, ORS 30.075, all confirm that both statutes were intended to remove death as a bar to bringing or continuing an action in two different situations: (1) When the defendant's wrongful conduct allegedly caused a deceased person's injuries—but not that person's death—the personal representative may bring a survival action under ORS 30.075 after the injured person's death; and (2) when the defendant's wrongful conduct allegedly caused the person's death, the personal representative may bring a wrongful death action under ORS 30.020, but not a survival action under ORS 30.075. And, if the decedent had brought a personal injury action before the decedent's death—and the personal representative alleges that the decedent's death was caused by the same wrongful acts or omissions that had caused the injury—then the personal representative can maintain that action as a wrongful death action under ORS 30.020 and recover the economic and noneconomic damages the decedent incurred between

the time of the wrongful conduct and the decedent's death. But the personal representative cannot bring a claim under the survival statute as a means of recovering attorney fees in the wrongful death action.

The limited lost chance theory of injury that we adopted in *Smith* allows a plaintiff in a medical malpractice case to recover damages to compensate for a patient's lost chance of a more favorable outcome. That theory of injury logically fits within a medical negligence case such as *Smith*, where a surviving patient brought his own action alleging negligence. Again, the injury alleged in *Smith* was the lost chance of a plaintiff who had suffered permanent brain damage to receive treatment that would have allowed the patient to live with "reduced or no stroke symptoms." 361 Or at 460. Such a theory of injury could also logically fit if, for example, the plaintiff in *Smith* had eventually died due to the defendants' alleged medical negligence. Under those circumstances, the plaintiff's personal representative might have a cognizable lost chance claim—asserted as an alternative or additional *claim* in the wrongful death *action*—to obtain compensation for the decedent's lost chance to receive treatment that could have allowed him to live longer before he died.

Thus, in some circumstances, a personal representative could assert a lost chance *claim* in a wrongful death *action* as an alternative or in addition to a wrongful death claim. A lost chance claim is not categorically precluded by alleging, in the alternative, that the defendant's negligence caused the decedent's death. A personal representative could, for example, recover damages under ORS 30.020(2) on a lost chance claim brought in the wrongful death action to compensate for the economic and noneconomic damages that the decedent suffered during the period between the defendant's wrongful conduct and the decedent's death. But the personal representative cannot use the survival statute as a basis for bringing a lost chance claim in the wrongful death action to recover her attorney fees under ORS 30.075(2) because the 1995 amendments to the wrongful death and survival statutes were intended to preclude that result.

5.  *Application to this case*

Applying those principles, we turn to the allegations in plaintiff's complaint. Plaintiff captioned her lost chance claim as a "survival action" and alleged that defendants' medical negligence had caused decedent "to suffer a loss of a chance at a better medical outcome." She did not specify what that "better medical outcome" would have been other than alleging that defendants' medical negligence caused decedent's death. She sought to recover economic and non-economic damages without specifying what those damages would be, and she sought to recover her attorney fees under ORS 30.075(2).

Plaintiff's allegation that defendants' medical negligence caused decedent's death did not preclude her from bringing a lost chance *claim* under *Smith* in the wrongful death *action*. To the extent that the economic and noneconomic damages that plaintiff sought to recover on her lost chance claim were to compensate for the damages that decedent had suffered during the period between the wrongful conduct and decedent's death, she could have recovered those damages in the wrongful death action under ORS 30.020(2). But plaintiff was not entitled to bring a lost chance claim as a "survival action" that is separate from her wrongful death action and recover attorney fees under ORS 30.075(2).

Although alleging a lost chance claim as an alternative or in addition to a wrongful death claim is not categorically precluded by an allegation that defendants' wrongful conduct caused decedent's death, plaintiff's allegations in this case did not state a lost chance claim that is cognizable under *Smith*. Plaintiff's allegations did not involve any lost chance of treatment, or a lost chance to live with reduced or no symptoms or some other better outcome, as had been alleged in *Smith*. And plaintiff's allegations did not include any allegations about "the percentage and quality" of any such loss, also as required by *Smith*. She did not plead, for example, that defendants' negligence more likely than not caused decedent to lose a 33 percent chance to live a longer life or to live with reduced or no symptoms. Neither did she plead that defendants' negligence more likely than not increased the likelihood that decedent would die from

his medical condition. Such allegations, had they been pled, might have been analogous to the lost chance claim recognized in *Smith*.[14]

Finally, because plaintiff did not specify in her complaint the economic and noneconomic damages that she sought to recover on her lost chance claim, she did not allege any types of damages that would be any different from the economic and noneconomic damages that are recoverable only in a wrongful death action under ORS 30.020(2) to compensate decedent for economic and noneconomic losses during the period between defendants' wrongful conduct and decedent's death. Rather, the only recovery plaintiff sought that would be different from the damages recoverable under ORS 30.020(2) were her attorney fees, which she claimed under the survival statute, ORS 30.075(2). But as explained above, attorney fees under the survival statute are not recoverable in a wrongful death action.

We therefore conclude that plaintiff did not plead a separate, cognizable lost chance claim in this wrongful death action. Accordingly, the trial court did not err in granting defendants' motion to dismiss her lost chance claim.

## III.   CONCLUSION

As to plaintiff's wrongful death claim under ORS 30.020, we conclude that the trial court did not err in providing the jury with an instruction based on UCJI 44.03 because, in this case, that instruction correctly stated the law and would not have been misleading or confusing to the jury. As to plaintiff's lost chance claim under the survival statute, ORS 30.075, we conclude that plaintiff did not state a cognizable claim and, therefore, that the trial court did not err in granting defendants' motion to dismiss that claim.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

---

[14] To the extent that plaintiff's theory is that she should be able to recover damages without proving that, more likely than not, defendants' negligence caused decedent's death, so long as she proves that there was a *chance* (although not more likely than not) that defendants' negligence caused decedent's death, the claim fails because, in *Smith*, we rejected the theory that a lost chance claim can be based on a lowered standard of proof of causation. 361 Or at 482.

**FLYNN, C. J.,** concurring in part and concurring in the judgment.

I agree with the majority that the trial court did not commit reversible error, either in holding that the allegations of the survival action in this case fail to state a claim or in instructing the jury, but I write separately to emphasize that the concept described in Uniform Civil Jury Instruction (UCJI) 44.03 does not belong in a uniform jury instruction.[1] That instruction, which was incorporated into the jury instructions in this case, told the jury, in relevant part, that "[a] physician does not guarantee a good result by undertaking to perform a service." UCJI 44.03.

The rule for jury instructions is that "[e]verything which is reasonably capable of confusing or misleading the jury should be avoided." *Estate of Michelle Schwarz v. Philip Morris Inc.*, 348 Or 442, 454, 235 P3d 668, *adh'd to on recons*, 349 Or 521, 246 P3d 479 (2010) (internal quotation marks omitted). And I agree with the Court of Appeals that UCJI 44.03 fails that test. *Martineau v. McKenzie-Willamette Medical Center*, 320 Or App 534, 544, 514 P3d 520 (2022). The majority suggests that the jury would have understood the challenged instruction, in context, as equivalent to the established principle that physicians are not warrantors of a "cure." 371 Or at 257. Even accepting that premise, the instruction distracted the jury from the relevant inquiry and was "reasonably capable of confusing or misleading the jury," for at least two reasons.

First, I agree with the Court of Appeals that instructing the jury on the concept described in UCJI 44.03 obscures the standard of care by which the jury must evaluate whether the physician was negligent. *Martineau*, 320 Or App at 544. Since 1975, the standard of care in medical negligence cases has been prescribed by statute. Or Laws 1975, ch 796, § 10d. That statute currently specifies:

> "A physician licensed to practice medicine or podiatry by the Oregon Medical Board has the duty to use that degree of care, skill and diligence that is used by ordinarily

---

[1] As the majority noted, the Uniform Civil Jury Instruction Committee withdrew UCJI 44.03 after the Court of Appeals issued its decision. 371 Or at 260 n 8.

careful physicians in the same or similar circumstances in the community of the physician or a similar community."

ORS 677.095(1).

Although the majority is correct that opinions of this court have endorsed the general proposition that a "physician is not a warrantor of a cure," those opinions predate the statutory standard of care and almost exclusively reflect attempts to explain why certain evidence is legally insufficient to prove medical negligence. *See Mayor v. Dowsett*, 240 Or 196, 214, 400 P2d 234 (1965), *questioned on other grounds by Arrowood Indemnity Co. v. Fasching*, 369 Or 214, 503 P3d 1233 (2022) (citing the principle that a physician is not a "warrantor of cure" to explain why the doctrine of *res ipsa loquitur* generally is unavailable to prove medical negligence) (internal quotation marks omitted)); *Crewse v. Munroe*, 224 Or 174, 177, 355 P2d 637 (1960) (rejecting the argument that negligence could be presumed from evidence that anesthesia had caused spinal inflammation by citing the proposition that "a physician is not a warrantor of a cure" and that "[h]is liability rests solely on accountability for his negligent or wrongful acts"); *Malila v. Meacham*, 187 Or 330, 354, 211 P2d 747 (1949), *abrogated in part by Rogers v. Meridian Park Hospital*, 307 Or 612, 772 P2d 929 (1989) (citing the principle "that a physician or dentist is not a warrantor of cures" in connection with the principle "that the doctrine of *res ipsa loquitur* does not apply in malpractice cases"); *Hamilton v. Kelsey*, 126 Or 26, 29-30, 268 P 750 (1928) (before considering whether evidence permitted jury's verdict for the plaintiff in malpractice action, reciting that a physician's "undertaking is not an absolute one to cure, not to restore a condition of good health; nor is he an insurer of the efficacy of his services"); *see id.* ("[A physician's] undertaking is to exercise that degree of care, skill, diligence, and knowledge which is ordinarily possessed by the average of the members of his profession in good standing in similar localities.").[2]

---

[2] In one post-1975 case, *Rogers*, 307 Or at 615, 619, this court referred to the proposition that "a doctor does not promise a cure" as a "notion" and a source of the "error of judgment" rule, which this court then concluded was not appropriate to include in a jury instruction, because it is "unduly confusing and incorrectly states the law."

The one case in which this court considered a jury instruction that included the principle that physicians do not guarantee a "cure," involved an instruction that included an important and correct limitation on that principle:

> "A doctor does not undertake to warrant a cure or that his treatment shall necessarily be successful, and is not responsible for want of success *unless that want of success results from a failure to exercise ordinary care*."

*Eckleberry v. Kaiser Foundation et al*, 226 Or 616, 625, 359 P2d 1090 (1961) (emphasis added). We held that the given instruction was a correct statement of the law, but we did not discuss whether the instruction was misleading or confusing. *Id*. at 626. But UCJI 44.03 omits that key limitation and, as a result, fails to instruct the jury how to analyze a case in which the want of a cure "results from a failure to exercise ordinary care."

Thus, it is not enough that UCJI 44.03 may faithfully paraphrase a principle described in some of this court's decisions, when those decisions do not purport to describe a principle that should be included in a jury instruction on the applicable standard of care. As we have cautioned, even "[a]n instruction that accurately quotes or faithfully paraphrases an appellate decision is not necessarily beyond reproach." *Rogers*, 307 Or at 616. Indeed, "because many appellate opinions are written with no view that they will be turned into instructions, care must be exercised in using the language of these opinions for instructions to juries." *Id.* (summarizing warning of *Amfac Foods v. Int'l Systems*, 294 Or 94, 99 n 3, 654 P2d 1092 (1982)). Particularly where the applicable standard of care is now governed by statute, adding the abstract and unlimited proposition set out in UCJI 44.03 is likely to obscure that standard and confuse or mislead the jury.

The second reason that UCJI 44.03 is "reasonably capable of confusing or misleading the jury" is that it directs the jury to base its determination of whether the physician was negligent on a consideration that is only a consequence of that determination—whether the physician has "guarantee[d]" a result, or cure. The ordinary meaning of a "guarantee" is something that one person is entitled to receive

from another. *See Webster's Third New Int'l Dictionary* 1007 (unabridged ed 2002) (defining "guarantee," most pertinently, as "an agreement by which one person undertakes to secure another in the possession or enjoyment of something"). And in the context of medical care, ORS 677.095(1) describes the primary thing that a physician undertakes in treating a patient: to exercise "that degree of care, skill and diligence that is used by ordinarily careful physicians in the same or similar circumstances in the community."

Thus, whether a physician in a particular case can be understood to have guaranteed a "cure" is irrelevant to the jury's assessment of whether the physician's performance met the standard of care. It is simply a conclusion that follows from a jury's answer to that question: If the jury finds that the physician's performance met the standard of care specified in ORS 677.095(1)—despite failing to deliver a cure—then it follows that the physician's undertaking of treatment did not involve the guarantee of a cure. But if a jury finds that a patient would have experienced a cure had the physician exercised the requisite "degree of care, skill and diligence," then it follows that the undertaking of treatment effectively was a guarantee of that cure.

Either way, the concept of guaranteeing a cure simply follows as a consequence of the jury's negligence finding. And instructing the jury to consider a consequence of its finding on the question of negligence risks confusing the jury about the standard that it must use to evaluate whether the physician was negligent. Worse, in a case in which the evidence permits a jury to find that a patient would have been cured by a physician exercising the "degree of care, skill and diligence that is used by ordinarily careful physicians in the same or similar circumstances in the community[,]" UCJI 44.03 can mislead the jury to believe that the physician was not negligent, despite any failure to exercise the requisite degree of care, skill, and diligence, if the consequence of such a finding would be that the physician guaranteed a cure.

Because UCJI 44.03 was "reasonably capable of confusing or misleading the jury," that instruction was improper under the test articulated in *Schwarz*, 348 Or at 454. I

emphasize that this court has *never* previously approved of instructing the jury on the concept described in UCJI 44.03 without the limiting language used in *Eckleberry*. And if, as the majority implies, some prior criticism of an instruction is required before we will hold that it was error to give that instruction, 371 Or at 259, then this separate opinion can serve that function for future cases. In sum, although I agree that the trial court's judgment should be affirmed, I disagree with the majority's conclusion that the trial court did not err in its instructions to the jury. Accordingly, I respectfully concur in part and concur in the judgment.

Walters, S. J., joins in this concurring opinion.