No. 299          May 8, 2024          473

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

Jamie MARTINEAU,
Personal Representative of the
Decedent, Aaron Martineau,
*Plaintiff-Appellant,*

*v.*

McKENZIE-WILLAMETTE MEDICAL CENTER,
an assumed business name of
McKenzie-Willamette Regional Medical Center Associates,
a limited liability company,
*Defendant,*

*and*

RADIOLOGY ASSOCIATES, P.C.,
a corporation;
Dariusz Zawierucha, M.D., an individual;
Cascade Medical Associates,
the assumed business name of Doctor's Emergency Room
Corporation, P.C.,
a corporation;
and Gary Josephsen, M.D., an individual,
*Defendants-Respondents.*

Lane County Circuit Court
17CV36517; A172846

On remand from the Oregon Supreme Court, *Jamie Martineau v. McKenzie-Willamette Medical Center*, 371 Or 247, 533 P3d 1 (2023).

Argued and resubmitted on remand April 11, 2024.

Travis Eiva argued the cause and filed the opening and reply briefs for appellant.

Alice S. Newlin argued the cause for respondents Radiology Associates and Dariusz Zawierucha, M.D. Also on the answering brief were Jay W. Beattie, Nikola L. Jones, and Lindsay Hart, LLP.

Hillary A. Taylor argued the cause for respondents Gary Josephsen, M.D., and Cascade Medical Associates. Also on the answering brief were Lindsey H. Hughes and Keating Jones Hughes, P.C.

Before Aoyagi, Presiding Judge, and Egan, Judge, and Kamins, Judge.

AOYAGI, P. J.

Affirmed.

**AOYAGI, P. J.**

This medical malpractice case arises from a young man's untimely death from a cardiac injury. The case is on remand to us after the Supreme Court reversed our decision in *Martineau v. McKenzie-Willamette Medical Center*, 320 Or App 534, 514 P3d 520 (2022), *rev'd*, 371 Or 247, 533 P3d 1, *adh'd to as modified on recons*, 371 Or 408, 537 P3d 542 (2023). Our earlier decision addressed plaintiff's first and fifth assignments of error, which the Supreme Court has now resolved in defendants' favor. 371 Or 247. Our task on remand is to address three remaining assignments of error that we did not reach in our earlier decision. 371 Or at 412. Seeking a new trial on her wrongful death claim, plaintiff argues that the trial court erred with respect to Exhibit 92B, by excluding or limiting its admission, and by excluding it from the jury's deliberative materials. She further argues that the trial court erred by not allowing her to show the jury a textbook image while cross-examining a defense expert.[1] For the following reasons, we affirm.

## I.  FACTS

Given the posture of this case, we limit our discussion to the wrongful death claim and the facts relevant to the issues currently on appeal.

Plaintiff is the personal representative of the estate of the decedent, Aaron Martineau. Plaintiff's wrongful death claim arises out of the medical care that Martineau received from defendants when he visited the emergency room after experiencing chest pain and other symptoms. Defendant

---

[1] Neither Exhibit 92B nor the medical treatise image are in the appellate record. For an item to be made part of the appellate record, it generally must be either (1) admitted into evidence by the trial court, or (2) made part of the trial court record through an offer of proof. Here, neither item was admitted into evidence, and any offers of proof were limited to counsel describing the item, without asking that the actual item be placed in the record for appeal purposes. *See Ferguson v. Nelson*, 216 Or App 541, 549, 174 P3d 620 (2007) ("An appellant bears the burden of providing a record sufficient to demonstrate that error occurred."). Plaintiff has included visuals of Exhibit 92B and the medical treatise image in her appellate briefing, but that does not make them part of the record properly before us, so we have disregarded those visuals in conducting our analysis. For the benefit of the bench and bar, we emphasize that, if a party wishes to have a non-admitted exhibit available to the appellate courts in the event of an appeal, it must take steps in the trial court to make it part of the record.

Josephsen examined Martineau and arranged for a chest x-ray, which defendant Zawierucha read. Josephsen concluded that Martineau did not have an urgent cardiovascular problem or need further testing immediately. Martineau went home, where he died approximately 24 hours later.

Plaintiff brought a wrongful death claim against Josephsen and the Doctor's Emergency Room Corporation, P.C. (the ER defendants), and Zawierucha and Radiology Associates, P.C. (the radiology defendants), alleging that they negligently caused Martineau's death. Specifically, plaintiff alleged that the ER defendants were liable for negligently examining Martineau and assessing his condition, failing to obtain adequate imaging tests, and failing to diagnose and treat his heart condition, and that the radiology defendants were liable for negligently reviewing his chest x-ray, failing to order additional imaging, including a CT scan, and failing to diagnose his heart condition.

The trial on plaintiff's wrongful death claim was largely a battle of experts and included opinions about whether Martineau's chest x-ray, admitted as Exhibit 7, was normal or abnormal. Plaintiff called, among other experts, Dr. Patten, to establish that the defendants had negligently reviewed that x-ray. During Patten's testimony, plaintiff put up boards displaying images of "normal" chest x-rays, including a "normal" chest x-ray from an unidentified 29-year-old male patient of Patten's that was marked as Exhibit 92. Plaintiff explained that she was showing the normal x-rays "for illustrative purposes," which the court allowed.

Later in direct examination, plaintiff asked Patten about a document marked "Exhibit 92B," which was described as a side-by-side comparison of two x-rays: first, Martineau's x-ray from the hospital, which had previously been admitted as Exhibit 7 and, second, a "normal" x-ray of Patten's 29-year-old patient, which had previously been used as a demonstrative marked Exhibit 92. Using Exhibit 92B, Patten described differences between the two x-rays and outlined what he considered an abnormal contour on the Martineau x-ray.

At that point, plaintiff offered Exhibit 92B into evidence. The radiology defendants objected to its admission

into evidence, stating that it should be allowed only as a demonstrative. Plaintiff began to respond, "It can go back as an exhibit, Your Honor. It's showing the medical opinion—." The parties then agreed that the matter should be discussed outside the jury's presence. When the discussion resumed outside the jury's presence, the court stated that "illustrative exhibits do not go into the jury." The court continued, "I suppose you can mark them. You have an illustrative exhibit attached to a substantive exhibit. I suppose if you can cut it in half I'll deal with it." Plaintiff argued that Exhibit 92B was "evidence of the opinion. It's not necessarily illustrative in the same way that just a diagram is. This is actually how you understand a normal versus the actual identification of the injury." The court adhered to its ruling that Exhibit 92B (and other exhibits showing "normal" x-rays) could be used for illustrative purposes but would not be admitted or sent to the jury for deliberations.

The question of the admissibility of the "normal" x-rays, including Exhibit 92B, resurfaced multiple times during trial. The court consistently rejected admitting the "normal" x-rays into evidence. At one point, the court explained:

> "It was an expert that interpreted these for you to explain the difference. I'm not going to put those in, otherwise that becomes testimonial and I'm running the risk—it's one thing to have medical record[s] involving this particular individual and his X-ray. I'm not going to start adding X-rays to it."

The court then gave plaintiff an opportunity to make a further record, and plaintiff stated that the normal x-rays were critical for the jury to evaluate the expert testimony regarding Martineau's x-ray and, while they might be illustrative, were also "substantive" because they were useful to the jury as evidence of a normal x-ray of someone of plaintiff's age.

Much later in the trial, the court returned to the issue again, stating:

> "The only thing I haven't let in is X-rays—purported normal X-rays of other persons in this case that don't have any drawings on them. And I'm not going to let this jury conduct radiology in the jury room by starting to compare

X-rays back and forth and make their own evaluation. I think we all agree they have to base it on either your experts' testimony or their experts' testimony."

As previously mentioned, and as referenced in the court's explanation, there was competing expert testimony about Martineau's chest x-ray. One of defendants' experts was Dr. Slater, a cardiothoracic surgeon. On direct examination, Slater testified that he did not see any aortic abnormality visible on Martineau's chest x-ray. On cross-examination, plaintiff sought to impeach Slater's testimony with a treatise, *Acute Aortic Disease*, which other experts had identified as a learned treatise and reliable authority on evidence of aortic disease in x-rays. Plaintiff directed Slater to a treatise page showing "a normal chest X-ray up at the top," then asked Slater whether it showed "an illustration on that normal that says look into this area for the—if the cardiomediastinal silhouette shadow swings into that area, that's evidence of aortic aneurysm or aortic disease."

After a back and forth in which plaintiff and Slater seemed to be looking at different things, plaintiff tried to direct Slater to a particular "diagram," at which point the radiology defendants' counsel interjected, "Excuse me. Don't publish that to the jury. That's not allowed." Plaintiff's counsel responded, "Sure," then proceeded to ask Slater a series of questions about what the diagram showed, with Slater often agreeing with counsel's characterization of what it showed. Eventually, plaintiff's counsel returned to the issue of publishing the diagram or image to the jury:

"Q.   So we have this article and it says this is the evidence of aortic disease in the chest X-ray to look for. That right there or that right there.

"And, Your Honor, I know that you'd like us to cross-examine, but this is actually an image, and I think it is worthwhile to publish to the jury."

The radiology defendants' counsel objected. The court sustained the objection, stating, "You can ask about it, but that's all."[2]

_____

[2] In sustaining the objection, the court referred to an earlier ruling that it had made when plaintiff sought to have the jury see the treatise and read along as counsel used it during cross-examination. The court had ruled, "It's not how

The jury ultimately rendered a verdict for defendants.

## II.   EXHIBIT 92B

Plaintiff's second and third assignments of error concern Exhibit 92B. Plaintiff argues that the trial court erred, respectively, by "not admitting or limiting the admissibility of exhibit 92B" and by "refusing to provide exhibit 92B to the jury for deliberations." Given the arguments that the parties have made on appeal, and in aid of addressing those specific claims of error, we begin with a general discussion of the use of demonstrative and illustrative exhibits at trial.[3]

A.   *Demonstrative and Illustrative Exhibits Generally*

The Oregon Evidence Code contains no mention of "demonstrative" or "illustrative" exhibits. *See* ORS 40.010 - 40.585. In that void, the parties have made arguments in this case that evince a fundamental disagreement as to what it means for an exhibit to be shown to the factfinder for "demonstrative" or "illustrative" purposes, versus being admitted as substantive evidence.

Various courts and scholars have recognized that the terms "demonstrative" and "illustrative" are not used consistently in modern trial practice, and that such inconsistency can create confusion. As the Seventh Circuit observed a decade ago:

  "The term 'demonstrative' has been used in different ways that can be confusing * * *. In its broadest and least helpful use, the term 'demonstrative' is used to describe any physical evidence. When the term is used in this way, demonstrative exhibits may range from Shakespeare's

_____

you do cross-examination by virtue of a treatise. It doesn't make the treatise admissible."

  [3] For present purposes, we do not distinguish between "demonstrative" and "illustrative" exhibits, both because we are speaking broadly and because the parties have used the terms interchangeably. However, our discussion is limited to exhibits. *See Christensen v. Cober*, 206 Or App 719, 727, 138 P3d 918 (2006) (explaining that one type of "demonstrative evidence" involves "the display of direct evidence, usually a person or object, in a courtroom" to convey "a firsthand sense impression to the trier of fact"—which typically "does not involve the use of a tangible exhibit" (internal quotation marks omitted)).

version of Marc Antony's funeral oration displaying the bloody toga in *Julius Caesar* \*\*\* to the knife in *Twelve Angry Men*. As jurors have become more visually oriented, counsel in modern trials seek to persuade them with an ever-expanding array of objects, maps, charts, displays, summaries, video reconstructions, computer simulations, and so on.

"As Professors Wright and Miller lament, the term, 'demonstrative' has grown 'to engulf all the prior categories used to cover the use of objects as evidence \*\*\*. As a result, courts sometimes get hopelessly confused in their analysis.' 22 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 5172 (2d ed.); *see also* 5 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 9:22 (3d ed.) (identifying at least three different uses and definitions of the term 'demonstrative' evidence, ranging from all types of evidence, to evidence that leaves firsthand sensory impressions, to illustrative charts and summaries used to explain or interpret substantive evidence). The treatises struggle to put together a consistent definition from the multiple uses in court opinions and elsewhere."

*Baugh ex rel Baugh v. Cuprum S.A. de C.V.*, 730 F3d 701, 706 (7th Cir 2013) (some internal citations omitted; ellipses in second paragraph in original).

To promote more consistency in its own jurisdiction, the Seventh Circuit has advocated using the term "demonstrative" narrowly to refer to persuasive pedagogical tools, as distinct from witness demonstrations, courtroom reenactments, and the like. *Id*. It then divides all exhibits into two categories: (1) *admitted exhibits*, which are substantive evidence, and which are included in the jury's deliberative materials; and (2) *nonadmitted exhibits*, which may be used for demonstrative or illustrative purposes, but which are not substantive evidence, and which should not be made part of the jury's deliberative materials unless agreed by the parties. *Id*. at 708.

Under that approach, the very act of "labeling an exhibit 'demonstrative' signifies that the exhibit is not itself evidence—the exhibit is instead a persuasive, pedagogical tool created and used by a party as part of the adversarial

process to persuade the jury." *Id*. at 706; *see also* Robert D. Brain & Daniel J. Broderick, *The Derivative Relevance of Demonstrative Evidence: Charting Its Proper Evidentiary Status*, 25 UC Davis L Rev 957, 961 (1992) ("Demonstrative proof has only a secondary or derivative function at trial: it serves only to explain or clarify other previously introduced, relevant substantive evidence."). By asking the court to "admit" an exhibit, the offering party alerts the judge and other parties that it is being offered "as substantive evidence," whereas asking to use an exhibit "for only demonstrative purposes" signals that it "is argumentative and persuasive in nature." *Baugh*, 730 F3d at 708.

Using the act of admission as the dividing line between substantive evidence and illustrative tools serves two ends. It forces offering parties to carefully evaluate whether they want to offer an exhibit as substantive evidence—and are willing to run the gauntlet of the rules of evidence to establish its admissibility—or are satisfied to simply use it to illustrate a point. As we noted in *Christensen v. Cober*, 206 Or App 719, 733 n 9, 138 P3d 918 (2006), there is often more leeway given to use demonstrative exhibits precisely *because* they are not substantive evidence:

> "It is sometimes the case that litigants do not contest the use in testimony of demonstrative evidence that they do not expect to be submitted to the jury for use in its deliberations. By failing to object to such evidence, an opponent may wish to avoid distracting and time-consuming courtroom detours into controversies that are collateral to the central issues in the case. Likewise, the proponent of such evidence may think it sufficient to achieve a courtroom impact from its use without litigating its admissibility."

*See also Baugh*, 730 F3d at 707 (noting the potential benefits of using an exhibit only as a "demonstrative" and thus avoiding "protracted disputes" over admissibility).

Using the act of admission as the dividing line also reduces the risk of parties failing to make valid evidentiary objections due to confusion about the offering party's intentions. "If the 'demonstrative' label is not applied consistently during the trial and jury deliberations, it may lull the opposing party into a false sense of complacency, leading

[the opposing party] to waive valid objections to the admissibility of the demonstrative exhibit as substantive evidence." *Id.* at 708.

In Oregon, although we have not articulated the point as expansively as the Seventh Circuit, we have suggested a similar approach to maintaining the distinction between demonstrative and illustrative exhibits used in the courtroom and exhibits admitted as substantive evidence. Specifically, in *Christensen*—a case that we discuss more shortly—we explained that the "better practice" for handling an "exhibit that is to be used only for the purpose of a courtroom illustration or demonstration, but not to be admitted in evidence," is to mark it for identification, then "make certain that its courtroom use is clearly explained in the record." 206 Or App at 733 n 9.

A corollary to the point in *Christensen*, which we add here, is that, when a party asks the court to *admit* an exhibit previously described as "demonstrative" or "illustrative," the party should make clear what it seeks to gain from admission. For example, the party might seek only to have the exhibit included in the jury's deliberative materials, or the party might seek to have the exhibit converted into substantive evidence, which are likely to lead to different objections. Offering parties should be clear about their intentions, and the trial court should be equally clear in ruling about the consequences of admission or non-admission.[4]

---

[4] We note that, under existing Oregon case law, it is unclear whether trial courts have discretion to *admit* a demonstrative or illustrative exhibit that is not to be used as substantive evidence (presumably with a limiting instruction) or to include a *non-admitted* demonstrative or illustrative exhibit in the jury's deliberative materials without the consent of the parties—and, if so, the extent of that discretion. It appears that most jurisdictions that have considered those questions answer them in the negative, although at least one answers them in the affirmative. *Compare Baugh*, 730 F3d at 708 (answering both in the negative), *with United States v. Downen*, 496 F2d 314, 321 (10th Cir), *cert den*, 419 US 897 (1974) (answering both in the affirmative). There is language in *Christensen* that could be read to indicate that we follow the minority approach on those questions. *See Christensen*, 206 Or App at 728 ("The decision whether to admit demonstrative evidence is vested in the trial court's discretion."). However, suffice it to say, upon scrutiny, it is unclear to us that any existing Oregon case law squarely answers those questions, as to demonstrative exhibits in the narrower sense of that term.

In this case, the court did *not* exercise any discretion that it had to admit Exhibit 92B as an illustrative exhibit, nor did it exercise any discretion that it had to include Exhibit 92B in the jury's deliberative materials as a nonadmitted

B.  *Exhibit 92B Specifically*

Having provided that general framework for our discussion, we turn to Exhibit 92B. Plaintiff argues in her second assignment of error that the trial court erred by refusing to admit Exhibit 92B into evidence, and she argues in her third assignment of error that the trial court erred by not including Exhibit 92B in the jury's deliberation materials. Those issues are closely related, and plaintiff presents a combined argument, so we discuss them together. In short, we conclude that plaintiff has not identified any error in the trial court's decision not to admit Exhibit 92B into evidence and that, having not admitted Exhibit 92B into evidence, the trial court did not err by excluding it from the jury's deliberation materials.

Both parties rely on *Christensen*, so we begin there. The issue in *Christensen* was whether the trial court had erred "in failing to submit to the jury for use in its deliberations a photograph that the court had *admitted into evidence* for demonstrative purposes." *Id.* at 721 (emphasis added). The exhibit—a picture of what could be seen during a surgical procedure on the transverse carpal ligament—was "received for demonstrative purposes" and was "marked on the trial court's exhibit list as having been received only for demonstrative purposes." *Id.* at 722 (internal quotation marks omitted). When the jury was excused to deliberate, the trial court sent other exhibits to the jury room but not those "that had been received in evidence for demonstrative purposes." *Id.* at 724.

On appeal, the *Christensen* plaintiff argued that the trial court "was required to submit all exhibits received in evidence—regardless [of] whether they were designated as demonstrative exhibits—for the jury to use in its deliberations." *Id.* at 725. Looking to ORCP 59 C(1) ("Upon retiring for deliberation the jury may take with them all exhibits received in evidence, except depositions."), we agreed that the jury should have been given all *admitted* exhibits for deliberative use, regardless of how individual exhibits were designated:

exhibit. We therefore need not address whether the court hypothetically had discretion to do either thing.

"The decision whether to admit demonstrative evidence is vested in the trial court's discretion. Regardless of whether an exhibit that is admitted in evidence is designated as demonstrative or not, though, there is no rule of evidence or trial procedure that authorizes the exclusion of such an exhibit from the jury's use and consideration during deliberations. In fact, as we now explain, ORCP 59 C(1) states the opposite rule ＊＊＊."

*Christensen*, 206 Or App at 728 (internal citation omitted); *see* ORCP 59 C(1) (providing for the jury to "take with them all exhibits received in evidence, except depositions").

In other words, in *Christensen*, where the exhibit *had been admitted into evidence*, we essentially treated the "demonstrative" designation as equivalent to a limiting instruction. That designation limited how the jury could use the exhibit, but it did not change the fact that the exhibit had been "received in evidence" and therefore had to be made available during jury deliberations under ORCP 59 C(1).[5]

This case presents the opposite situation from *Christensen*. The demonstrative exhibit at issue in *Christensen* was admitted into evidence, so it had to be included in the jury's deliberative materials. Here, by contrast, the trial court followed the "better practice" identified in *Christensen*. *Id.* at 733 n 9. It marked Exhibit 92B for identification but clearly ruled that it was to be used only for courtroom illustration, not admitted into evidence. Consequently, plaintiff's second and third assignments of error rise or fall together. If the court erred in refusing to admit Exhibit 92B, then it also erred in excluding it from the jury's deliberative materials. *See id.* at 728. Conversely, if the court did not err in refusing to admit Exhibit 92B, then it also did not err in excluding it from the jury's deliberative materials. *See id.*; *see also generally Libbee v. Permanente Clinic*, 269 Or 543, 546, 525 P2d 1296 (1974) ("There is no doubt that it was error to allow the

---

[5]  The issue in *Christensen* was whether the exhibit should have been included in the jury's deliberative materials once it was admitted. How the jury could use the exhibit was not at issue. Thus, while *Christensen* requires all admitted exhibits to be included in the jury's deliberative materials, it says nothing about the proper use of demonstrative exhibits (admitted or non-admitted) by the factfinder. 206 Or App at 732.

jury to consider an exhibit which had not been received in evidence.").

Plaintiff has failed to develop any meaningful argument as to how the trial court erred in refusing to admit Exhibit 92B—which included a "normal" x-ray of an unidentified patient—into evidence. Neither *Christensen* nor any other case cited by plaintiff stands for the proposition that a party is automatically entitled to have a demonstrative or illustrative exhibit admitted into evidence. To the extent that plaintiff sought to convert Exhibit 92B into substantive evidence by admitting it, plaintiff needed to be clearer on that point below, which would have promoted development of the record as to the specific reasons that the trial court did not consider the "normal" x-rays to be admissible as substantive evidence under the evidence rules. Instead, the discussion was framed by plaintiff's initial description of the "normal" x-rays as "illustrative" evidence, and the parties ended up talking past each other to a degree. Even on appeal, plaintiff has not explained how Exhibit 92B was admissible under the Oregon Rules of Evidence.

In sum, we reject the second assignment of error because plaintiff has not identified any error in the court's decision not to admit Exhibit 92B into evidence. *See Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 700 n 2, 64 P3d 1193, *adh'd to as clarified on recons*, 187 Or App 472, 68 P3d 259 (2003) ("[I]t is not this court's function to speculate as to what a party's argument might be" or "to make or develop a party's argument when that party has not endeavored to do so itself."). And we reject the third assignment of error because, as previously explained, once the trial court decided not to admit Exhibit 92B, it was not error to exclude it from the jury's deliberative materials. *See Christensen*, 206 Or App at 728 (holding that *admitted* exhibits should have gone to the jury room); *cf. Baugh*, 730 F3d at 708 ("Demonstrative exhibits that are not admitted into evidence should not go to the jury during deliberation, at least not without consent of all parties. We would not allow a lawyer to accompany the jury into the deliberation room to help the jurors best view and understand the evidence in the light most favorable to her client. The same goes for objects

or documents used only as demonstrative exhibits during trial.").

## III.   MEDICAL TREATISE IMAGE

In her fourth assignment of error, plaintiff challenges the trial court's ruling sustaining the radiology defendants' objection to plaintiff publishing to the jury an image from a medical treatise during cross-examination of Slater. The treatise, *Acute Aortic Disease*, had been established to be a reliable authority. Plaintiff argues that the court had no authority to restrict her cross-examination as it did and that doing so unfairly limited her ability to test the credibility of Slater's opinion that Martineau's x-ray was normal. Defendants counter that plaintiff was improperly trying to use the treatise as a demonstrative exhibit in the guise of cross-examination, so the trial court did not err.[6] They argue alternatively that any error was harmless, because plaintiff presented multiple experts and exhibits showing similar purportedly "normal" and "abnormal" x-rays.

"In Oregon, medical treatises or articles, like all learned treatises, are deemed to be hearsay and are not admissible as substantive evidence."[7] *Rieker v. Kaiser Foundation Hospitals*, 194 Or App 708, 710, 96 P3d 833 (2004). However, excerpts from medical literature may be used to impeach an expert witness. OEC 706 provides:

"Upon cross-examination, an expert witness may be questioned concerning statements contained in a published treatise, periodical or pamphlet on a subject of history, medicine or other science or art if the treatise, periodical or pamphlet is established as a reliable authority. A treatise, periodical or pamphlet may be established as a reliable authority by the testimony or admission of the witness, by other expert testimony or by judicial notice. Statements

[6] The ER defendants also question whether plaintiff adequately preserved this claim of error. We conclude that she did.

[7] In federal court, there is a hearsay exception for statements in learned treatises. *See* FRE 803(18) (regarding statements contained in treatises, periodicals, and pamphlets). The drafters of Oregon's hearsay exceptions declined to create such an exception, preferring to "retain the Oregon practice of using treatises in the cross-examination of expert witnesses" rather than admitting them as substantive evidence, because "they are likely to be misunderstood and misapplied in the absence of expert assistance and supervision." *Rieker*, 194 Or App at 710-11 n 1 (quoting Laird C. Kirkpatrick, *Oregon Evidence* 391-92 (Butterworth 1982)).

> contained in a treatise, periodical or pamphlet established as a reliable authority may be used for purposes of impeachment but may not be introduced as substantive evidence."

*See also State v. Morgan*, 251 Or App 99, 107, 284 P3d 496 (2012) (holding that it was error to exclude a treatise on hearsay grounds where the offering party "intended to use the evidence for impeachment, not substantive purposes, in precisely the manner that OEC 706 contemplates").

It is thus clear under OEC 706 that plaintiff could use statements in *Acute Aortic Disease* for purposes of impeaching Slater. The question is whether plaintiff was entitled to publish an image in the treatise to the jury in the course of doing so.

OEC 611(1) allows trial courts to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to make the interrogation and presentation effective for the ascertainment of the truth, avoid needless consumption of time and protect witnesses from harassment or undue embarrassment." The court's exercise of authority under OEC 611(1) involves a measure of discretion, but control over the proceedings is reasonable "only if it is fundamentally fair and allows opportunities for a reasonably complete presentation of evidence and argument." *Howell-Hooyman and Hooyman*, 113 Or App 548, 551, 833 P2d 328 (1992); *see also Smith v. Pacific Truck Express*, 164 Or 318, 333, 100 P2d 474 (1940) ("The manner of the examination, however, we believe to be within the control, reasonably exercised, of the trial judge.").

In this case, the court allowed plaintiff to use the treatise to impeach Slater, so that is not in dispute. What is disputed is the mode for doing so. The court allowed plaintiff to read from the treatise and describe an image in the treatise, in aid of asking Slater questions, but it did not allow counsel to publish the image to the jury.

We agree with defendants that the trial court did not abuse its discretion in limiting the mode of use in that manner. *State v. Pierce*, 307 Or App 429, 432, 477 P3d 437 (2020) ("[W]e review the court's exercise of control over the presentation of evidence and the examination of witnesses

for abuse of discretion." (Internal quotation marks omitted.)). Although plaintiff may have preferred to publish the treatise image to the jury, the treatise was not substantive evidence, and plaintiff was able to use the treatise effectively to impeach Slater while complying with the court's ruling regarding the image. Having reviewed the transcript, we see no reason that the jury would have been confused as a result of not being able to personally see the image discussed with Slater. Being able to publish the image, rather than having to describe it, might have been more convenient for plaintiff, but it was not necessary to the purpose of impeaching Slater, which plaintiff's counsel capably handled so as to avoid confusion.

Because the trial court's approach allowed a reasonably complete presentation of the evidence and was not fundamentally unfair, we cannot say that the court committed reversible error by limiting the mode of cross-examination as it did, *i.e.*, by not allowing publication of an image in the treatise to the jury during the questioning. *See K. M. J. v. Captain*, 281 Or App 360, 363-65, 384 P3d 532 (2016) (although trial courts have some discretion to control cross-examination, they cannot wholly deny the right to cross-examine); *cf. State v. Montijo*, 160 Ariz 576, 578, 774 P2d 1366 (Ariz Ct App 1989) (rejecting a party's argument that "the trial court erred in limiting his counsel's cross-examination of the pathologist by refusing to allow counsel to show photographs from a learned treatise to the jury during cross-examination," where "counsel was allowed to inquire about the photographs and explore why the wounds in this case did not correspond with the photographs" and counsel's "ability to present to the trier the theory that the pathologist had mischaracterized the wounds was not impaired"). We therefore reject the fourth assignment of error.

Affirmed.